■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v GERALD L. VAUGHN, Appellant. [712 NYS2d 193] —Mugglin, J. Appeal from a judgment of the County Court of Albany County (Breslin, J.), rendered August 16, 1996, upon a verdict convicting defendant of the crime of murder in the second degree.

On August 15, 1994, the badly decomposed body of Willie Price was discovered in his basement apartment at 47 Second Street in the City of Albany. Following a jury trial, defendant was acquitted of intentional murder in the second degree and convicted of depraved indifference murder in the second degree, and sentenced to a prison term of 25 years to life. On this appeal, defendant challenges the refusal of County Court to suppress defendant's oral and written statements made to the police on September 1, 1996 and October 6, 1996, and contends that the trial evidence was insufficient as a matter of law to support a finding of guilt beyond a reasonable doubt.

Beginning in mid-June 1994, defendant acted as a confidential informant for Albany Police Detective Richard Gould. In this capacity, defendant made a controlled drug purchase on July 16, 1994 from Price. The drug dealings of Price were brought to the attention of the Albany Police Department by defendant, who claimed that he stayed at Price's apartment periodically and had observed Price dealing drugs. After the body of Price was discovered, Gould asked defendant to obtain information regarding the murder. Defendant subsequently telephoned Gould and they met at the police station. Defendant related that a friend of his observed three individuals, one of whom he knew to be a drug dealer, run from Price's apartment. Defendant told Gould that if he was given $40, he could make a drug purchase from this individual and obtain his identity for the police. Although defendant was given $40 in cash, Gould heard nothing from defendant.

On September 1, 1994, Detective Leonard Richuitti, in the company of two other plainclothes detectives, went to an Albany post office looking for defendant. At the time, Richuitti was aware through Gould that defendant had made a controlled drug purchase from Price, that defendant told Gould he could get information concerning the Price homicide and that Gould had given defendant $40 to obtain this information. The detectives observed defendant at the post office and defendant consented to accompany the police officers "downtown" to speak to them. Outside of the post office but prior to entering the police vehicle, the officers handcuffed defendant's hands in front of his body. In the vehicle, while driving to the police station, they read defendant his *Miranda* warnings.

Upon exiting the vehicle at the police garage, the officers removed the handcuffs and for the first time advised defendant that they wished to question him concerning this homicide. Defendant then became nervous, started to noticeably perspire and fainted. The police called the paramedics and, while waiting for them, defendant revived and was taken to an interrogation room. Believing that defendant would be transported to the hospital, Richuitti asked the defendant if he had any weapons on his person and defendant responded "no". Richuitti further asked defendant if he could search a fanny pack strapped to defendant's body and defendant gave the pack to Richuitti. A search of the pack revealed a glassine envelope containing the residue of a substance which Richuitti believed to be cocaine and defendant was thereupon arrested for possession of a controlled substance in the seventh degree.

After preparation of the necessary paperwork for an arraign-

ment, Richuitti went to the hospital and met with defendant. At this time, defendant told Richuitti that on August 4 or 5, 1994, Price asked him to watch his apartment and gave him his keys; when Price returned with a woman, he gave defendant some money with which to buy beer; when defendant returned about two hours later, he found Price's body under a mattress and, in touching his neck to determine if there was a pulse, he got blood on his hand which he wiped on the wall; thereafter, he let two people into the apartment to get high and after they departed, he locked the door, threw the keys under the stairs and left.

On September 8, 1994, Richuitti saw defendant in Police Court. During a conversation with defendant, Richuitti learned that defendant intended to plead guilty to the narcotics charge and that he was willing to take a polygraph test regarding the statement that he made to Richuitti at the hospital. Defendant did plead guilty to criminal possession of a controlled substance in the seventh degree and received a sentence of 60 days in jail. On October 6, 1994, defendant was transported to the Police Department* and interviewed at various times throughout the day by Richuitti and Detective Kenneth Wilcox and Detective Lieutenant John Di Novo concerning the murder of Price. As a result of these interviews, defendant gave three oral statements and two written statements to the police. Following a suppression hearing held over two separate days, County Court denied defendant's suppression motion, except to the extent of suppressing any statements made by defendant on September 8, 1994.

We first address defendant's contention that the police lacked probable cause to take him into custody on September 1, 1994. The record establishes that by September 1, 1994, the police possessed information establishing a relationship between defendant and Price, resulting largely from defendant's periodic stays at Price's apartment, that defendant claimed to possess information concerning the Price homicide and that witnesses placed defendant in the vicinity of Price's apartment during the operative time frame, particularly one witness who identified defendant as the person who kicked in the door to Price's apartment in early August 1994. In denying defendant's suppression motion concerning the statement of September 1, 1994, County Court concluded that defendant was not in custody when he was transported from the post office to the police station.

---

* Defendant was apparently still incarcerated serving his 60-day sentence imposed on September 8, 1994.

While a trial court's determination of a suppression motion is accorded great weight and will not be disturbed unless clearly erroneous (*see, People v Burgess*, 241 AD2d 765, 767, *lv denied* 91 NY2d 870), we conclude that County Court's finding that defendant was not in custody on September 1, 1994 is unsupported by the record and clearly erroneous. Whether an individual is in the custody of the police is a factual matter to be resolved after an objective review of the totality of the circumstances (*see, People v Cleveland*, 257 AD2d 689, 691, *lv denied* 93 NY2d 871). To determine whether the circumstances presented appropriately support the conclusion that defendant was not in custody, the circumstances must be viewed from the perspective of a reasonable person, innocent of any crime, to ascertain whether that reasonable person would believe that he or she was free to leave the presence of the police (*see, People v Pulliam*, 258 AD2d 681, *lv denied* 93 NY2d 977; *People v Hardy*, 223 AD2d 839).

Under the facts presented here, we conclude that no reasonable person, innocent of any crime, while sitting handcuffed in a police vehicle with three plainclothes detectives, would believe that he or she was free to leave the presence of the police. The attempt by the police to explain the handcuffing of defendant as justified by safety concerns, both for themselves and for defendant, is not supported by the record which reveals that defendant was friendly and cooperative in his conduct and conversation at the post office and during the ride. Moreover, his hands were handcuffed in front of his body where he could still use them to attack the officers or to access his fanny pack, which had not yet been searched. While we recognize that the police may take appropriate self-protective measures by handcuffing a suspect under circumstances which do not rise to the level of an arrest (*see, e.g., People v Allen*, 73 NY2d 378), this is not such a case. Thus, despite a prior indication that defendant would voluntarily accompany the police "downtown", once he was handcuffed and taken away in a police vehicle the detention of defendant rose to the level of an arrest which triggers the traditional safeguard of the requirement of probable cause (*see,* CPL 140.10 [1] [b]; *Dunaway v New York*, 442 US 200; *People v Battaglia*, 56 NY2d 558, *revg on dissenting mem below* 82 AD2d 389, 395-397 [Hancock, Jr., J.]). Although the information possessed by the police clearly supports a reasonable suspicion, the information falls far short of supporting the conclusion that the police had probable cause to believe that defendant committed the murder.

The fact that defendant was detained in a custodial setting

does not necessarily require, as urged by defendant, the suppression of all subsequent custodial statements as the fruits of the poisonous tree. Subsequent custodial statements may be admissible when a sufficient attenuation of the link between the illegal detention and the custodial statements exists so as to remove the stigma of the initial police misconduct (*see, e.g., Brown v Illinois*, 422 US 590; *People v Rogers*, 52 NY2d 527, *cert denied* 454 US 898). In considering whether a sufficient attenuation exists, three general factors must be examined: (1) the proximity of the proffered statement to the arrest, (2) the flagrancy of the illegal detention, and (3) the occurrence of any significant events intervening between the illegal detention and the particular statement made by the defendant which the People seek to use in the prosecution (*see, Brown v Illinois, supra*, at 603-604; *see also, People v Martinez*, 37 NY2d 662).

Turning to the statement of defendant made at the hospital on September 1, 1994, we believe that there is not sufficient attenuation to support the admissibility of this statement. We agree with defendant's contention that the search of his fanny pack, the discovery of the contraband residue and subsequent arrest on the possession of a controlled substance charge, and the custodial interrogation that occurred several hours thereafter at the hospital all stem from the illegal detention and render defendant's statement the "fruit of the poisonous tree" which must be suppressed since no intervening act creating sufficient attenuation had occurred. Nevertheless, we conclude that any error resulting from the failure to suppress defendant's statement of September 1, 1994 was harmless beyond a reasonable doubt. The statement made by defendant was essentially exculpatory and at complete variance with later inculpatory statements. In our view, the record contains overwhelming proof of defendant's guilt and there is no reasonable probability that the erroneously admitted statements contributed to defendant's conviction (*see, People v Crimmins*, 36 NY2d 230, 237).

With respect to the admissibility of the statements made by defendant on October 6, 1994, however, we reach a different conclusion. Although these statements were made at a time when defendant was in jail as the result of an illegal arrest for criminal possession of a controlled substance, such arrest does not confer upon defendant unlimited immunity from questioning regarding the Price homicide (*cf., United States v Crews*, 445 US 463, 474; *People v Rogers*, 52 NY2d 527, *supra*; *People v Reisman*, 29 NY2d 278, *cert denied* 405 US 1041). The passage of time between the illegal arrest and October 6, 1994 is

itself sufficient attenuation to remove the stigma of the initial improper police conduct (*see, e.g., Brown v Illinois, supra; People v Rogers, supra*). Moreover, in the interim, the police obtained additional information, developed independent of the illegal detention of defendant or any custodial statements that he made arising therefrom, which information placed defendant in the company of a female, at Price's apartment, who later bragged that she killed a "dude" in Albany. Both the female and defendant were positively identified by witnesses. We conclude that this information, together with the information acquired by the police prior to September 1, 1994, sufficiently established probable cause and attenuated any taint arising from the illegal detention.

We next address defendant's contention that his statements should be suppressed because they were obtained in violation of his right to counsel. It is well settled that where a defendant is in custody and represented by an attorney on a charge, he or she cannot be questioned without counsel present on the pending matter or any other matter (*see, People v Burdo*, 91 NY2d 146, 149; *People v Rogers*, 48 NY2d 167; *People v Tenace*, 256 AD2d 928, 929, *lv denied* 93 NY2d 902). Where the defendant has not requested an attorney nor has counsel entered the proceedings on the pending charge, however, law enforcement may question the defendant on matters unrelated to the pending offense (*see, People v Ruff*, 81 NY2d 330, 333-334; *People v Kazmarick*, 52 NY2d 322, 326; *People v Tenace, supra*, at 929-930). On this record, there is no factual basis upon which to disturb County Court's determination that defendant's right to counsel concerning the criminal possession charge had not attached until after he gave his September 1, 1994 statement concerning the murder.

Likewise, we find no reason to disturb County Court's refusal to suppress defendant's statements of October 6, 1994. It is clear that on this date, any attorney-client relationship which existed with respect to the charge of criminal possession of a controlled substance in the seventh degree had long since terminated (*see, People v Bing*, 76 NY2d 331, 344; *People v Robles*, 72 NY2d 689, 698; *People v Colwell*, 65 NY2d 883, 885). Defendant offered no evidence to refute police claims that *Miranda* warnings were given or that he did not knowingly, intelligently and voluntarily waive those rights and speak to the police concerning the death of Price. Further, the inadmissibility of defendant's statement made on September 8, 1994 does not require suppression of his statements made on October 6, 1994. Clearly, sufficient time elapsed between the two events

so that any taint resulting from the September 8, 1994 statements was dissipated by the time the police interviewed defendant on October 6, 1994 (*see, People v Russell*, 269 AD2d 771, 772; *see also, People v Stith*, 69 NY2d 313, 317-318).

As a final matter, defendant's contention that the evidence adduced at trial was insufficient to support his conviction is without merit. A verdict is supported by legally sufficient evidence when the evidence, viewed in the light most favorable to the prosecution, supports the elements of the crime beyond a reasonable doubt (*see, People v Harper*, 75 NY2d 313, 316; *People v Bleakley*, 69 NY2d 490, 495; *People v Brigham*, 261 AD2d 43, 49). We are convinced that the evidence presented at trial and the reasonable inferences to be drawn therefrom support the jury's guilty verdict.

Mercure, J. P., Crew III, Rose and Lahtinen, JJ., concur. Ordered that the judgment is affirmed.